LEE, J.,
for the court.
PROCEDURAL HISTORY
¶ 1. In May 2000, a Rankin County Circuit Court jury convicted the appellant, Danny Wayne Russell, of kidnaping and aggravated assault. He was subsequently sentenced to serve eighteen years in jail for the kidnaping conviction and eighteen years in jail for the aggravated assault conviction, said sentences to run concurrently. Russell’s motion for judgment notwithstanding the verdict was denied, and he now appeals to this Court. On appeal, he argues that the State failed to prove he was guilty of aggravated assault and kidnaping, that the trial judge committed reversible error in granting the State’s peremptory instruction, that he was not afforded a speedy trial, and that he was denied effective assistance of counsel. We review the merits of these claims and find this matter must be reversed and remanded on the aggravated assault count and affirmed on the remaining issues.
FACTS
¶ 2. Danny Wayne Russell and Jerri-McDaniel dated and were briefly engaged in early 1999. On or about April 29, 1999, shortly after McDaniel ended their relationship, Russell telephoned McDaniel and asked if he could come to her home in Pearl to retrieve some personal items, to which McDaniel consented. Upon Russell’s arrival, McDaniel opened the door to let Russell in, at which point Russell grabbed her and forced her inside the kitchen and shocked her with a stun gun. After threatening to kill McDaniel, Russell forced her back to her bedroom where he shocked her again. Russell and McDaniel talked at length while they were in the bedroom, all the while Russell had the stun gun. After talking with Russell for approximately one hour, McDaniel told Russell she would resume dating him, which she later testified she said only to get him to leave. Once Russell left, McDaniel immediately called the police who located and pursued Russell, eventually chasing him back to McDaniel’s house where he was arrested. McDaniel went to a hospital to report the events, and a videotape taken of McDaniel reveals bruising and scratches on her back, which resulted from the continued shocks she incurred at Russell’s hands.
DISCUSSION OF THE ISSUES
I. THE STATE FAILED TO MEET ITS BURDEN OF PROVING THE DEFENDANT WAS GUILTY OF AGGRAVATED ASSAULT BY FAILING TO PROVE THAT A STUN GUN IS A DEADLY WEAPON AND THAT THE VICTIM DID INDEED SUFFER *554 SERIOUS BODILY HARM AS A RESULT OF THE DEFENDANT’S ACTS;
II. THE COURT ERRED IN GRANTING JURY INSTRUCTION S-1.
¶ 3. We recognize that the State is responsible for proving each element of the crime beyond a reasonable doubt. Hall v. State, 644 So.2d 1223, 1229 (Miss.1994). The elements of aggravated assault are:
A person is guilty of aggravated assault if he (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; or (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm....
Miss.Code Ann. § 97-3-7 (Supp.2001). Russell argues that the State failed to prove that a stun gun is a deadly weapon or is likely to produce death or serious bodily harm. The State presented and the court accepted Dr. Steven Hayne as an expert in the area of forensic pathology. Dr. Hayne testified as to the effects of electricity on the human body and gave his opinion concerning the potential effect a stun gun could have on the body. The defense offered Tim Smith Lyon as an expert to testify concerning the effects of stun guns as deadly weapons, and he testified concerning the mechanics of a stun gun and the use of such device in self-defense. The court found that although Smith Lyon was a firearms expert, he was not qualified to testify as an expert on stun guns. Thus, he was only permitted to testify as a lay witness.
¶ 4. The testimonies of both Dr. Hayne and Smith Lyon were informative, but neither person was qualified by the court as an expert to testify concerning whether a stun gun was indeed a deadly weapon or even a mechanism likely to produce death or serious bodily harm. However, we find that an expert was not needed to make such determination for the jury. We find that an average juror is familiar with the purposes for which a stun gun is used, namely to temporarily immobilize the victim. We refer back to the statutory definition of aggravated assault which states that a person is guilty of this crime if he attempts to cause or does cause serious bodily injury to another person or by attempting to cause such injury with a deadly weapon or other means likely to produce death or serious bodily harm. Miss.Code Ann. § 97-3-7(2) (Supp.2001). The videotape which showed the scratches and bruises McDaniel suffered due to Russell’s actions provided the jury sufficient evidence to determine whether or not Russell intended to seriously harm her. Thus, we find that even if the stun gun is not found to be a deadly weapon, whether or not the repeated use of a stun gun can cause serious bodily injury is an issue the jury can resolve without the necessity of expert testimony on the point.
¶ 5. We also recognize that a serious error occurred in the judge’s decision to give the State’s jury instruction S-l which reads:
If you find from the evidence in this case, beyond a reasonable doubt, that on or about the 29th day of April, 1999, in Rankin County, Mississippi, the Defendant Danny Wayne Russell, did:
1. Unlawfully, feloniously, knowingly and intentionally,
2. attempt to cause serious bodily injury to Jerri McDaniel, a human being, by repeatedly shocking her *555 with a stunn [sic] gun, a deadly weapon;
Then you shall find the defendant guilty of the crime of aggravated assault....
(emphasis added). We look to our standard of review concerning jury instructions: “In determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found.” Coleman v. State, 697 So.2d 777, 782 (Miss.1997). The instruction listed above is a peremptory instruction since it instructs the jury that a stun gun is indeed a deadly weapon. We find that the judge erred in giving this instruction, and for this reason we reverse and remand.
III. DID THE STATE MEET ITS BURDEN OF PROVING THE DEFENDANT WAS GUILTY OF KID-NAPING?
¶ 6. We look next to Russell’s argument concerning whether the evidence was sufficient to support the kidnaping conviction. Our standard of review concerning the sufficiency of the evidence states:
The credible evidence .'.. consistent with guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence. Matters regarding the weight and credibility of the evidence are to be resolved by the jury. We are authorized to reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.
Edwards v. State, 797 So.2d 1049 (¶ 14) (Miss.Ct.App.2001). We first note that, although Russell asserts to the contrary, statutes and case law in Mississippi have failed to recognize asportation as a necessary element of kidnaping. Holly v. State, 671 So.2d 32, 43 (Miss.1996). To the contrary, a person is guilty of kidnaping if he or she “shall without lawful authority forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be secretly confined or imprisoned against his or her will.... ” Miss. Code Ann. § 97-3-53 (Supp.2001). To more easily understand the breakdown of this particular code section, we look to a previous case which has outlined the statute in a more clear form:
In Hughes v. State, 401 So.2d 1100 (Miss.1981), this Court restated the statute to clearly set forth the elements of kidnapping: [sic]
Every person who shall, without lawful authority
(1) forcibly seize and confine any other;
(2) or shall inveigle or kidnap any other
(3) with intent
(a) to cause such person to be secretly confined or imprisoned in the state against his will,
(b) or to cause such other person to be sent out of this state against his will,
(c) or to cause such other person (1) to be deprived of his liberty, (2) or in any way held to service against his will ...
Under the statute the [S]tate must prove that a person, without lawful authority either (1) forcibly seized and confined another person, or (2) inveigled or kidnapped another person, intending to subject such person to either (a), (b), or (c) above.
*556 Evans v. State, 725 So.2d 613 (¶ 209) (Miss.1997). The language of the indictment charges that Russell did “willfully, unlawfully, feloniously, forcibly seize and confíne [McDaniel] with the intent to cause the said victim to be secretly confined or imprisoned against her will,” which is (1) and (a) above. There is no question that Russell used force to confine the victim by virtue of his use of the stun gun, but whether McDaniel was “secretly confined” or “imprisoned against her will” requires further discussion. See Edwards v. State, 797 So.2d 1049(¶ 21) (Miss.Ct.App.2001) (Only one or the other must be proven.).
¶ 7. We find the case Smiley v. State, 798 So.2d 584 (Miss.Ct.App.2001), disposi-tive on this matter. In Smiley, the defendant went to the home of Sandy Coleman, his ex-wife. Id. at (¶ 2). Coleman opened the door and found Smiley standing with a shotgun. Id. They wrestled as he forced his way into the home. Id. As Smiley sat on the couch with the shotgun in his hand, he explained to her and to her boyfriend, Keith Albright, who was also present that he was going to take Coleman’s car in exchange for money she owed him. Id. at (¶ 3). Coleman and Albright both testified that while Smiley was in the home, they did not feel free to leave, plus Coleman testified that she feared she would be killed that night. Id. at (¶ 5). Upon arresting Smiley, the police found in Smiley’s pocket a small knife, a larger knife, shotgun shells, duct tape and rope. Id. at (¶ 4). The trial court noted that “all the evidence put forth by the State, especially the duct tape and cord could certainly be inferred by the jury that Smiley had the intent to secretly confine them and imprison them against their will.” Id. at (¶ 23). We affirmed, finding the jury had the prerogative to determine whether or not evidence was sufficient to support the conviction of kidnaping. Id.
¶ 8. In the present case, immediately upon entering McDaniel’s home, Russell grabbed McDaniel, threatened her and shocked her with the stun gun. McDaniel testified that everywhere she went, Russell followed closely, holding the stun gun on her. McDaniel testified that she felt she was fighting for her life and that she did not feel free to leave, since he had threatened to kill her and she firmly believed he would. McDaniel testified that Russell kept a little bag with him at all times, including the day of this incident, which contained inhalers needed for his asthmatic condition. The police seized the bag upon arresting Russell and found the inhalers in the bag, along with duct tape, rope, handcuffs, and other personal items. Officer Brady Wiebe of the Pearl Police Department found the bag and he testified that, in his experience, the presence of these items indicated to him, “that someone was fixing to be tied up and kidnapped or hurt.”
¶ 9. As stated earlier, Russell’s challenge to his kidnaping conviction implicates the sufficiency of the evidence. Giving the prosecution all favorable inferences and accepting all credible evidence consistent with Russell’s guilt as true, we are permitted to reverse if we find that reasonable and fair-minded jurors could only find Russell not guilty. Edwards, 797 So.2d at (¶ 14). As occurred in Smiley, we find that the evidence in the present case is sufficient to sustain Russell’s conviction on the kidnaping charge, and we affirm.
IV. WAS RUSSELL’S STATUTORY RIGHT TO A SPEEDY TRIAL VIOLATED?
¶ 10. With regard to a person’s statutory right to a speedy trial, the relevant Mississippi statute reads: “Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the *557 court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned.” Miss.Code Ann. § 99-17-1 (Supp.2001) (emphasis added). As well, both the Mississippi and United States Constitutions insure the defendant a right to a speedy trial, though such calculation is made from the date of arrest rather than arraignment. See Miss. Const, art. 3 § 26; U.S. Const, amend. VI and XIV; Adams v. State, 583 So.2d 165, 167 (Miss.1991). Russell intermingles his argument that his statutory right was violated with a recitation of the Barker factors, which concern a constitutional violation. See Barker v. Wingo, 407 U.S. 514, 529-30, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). We review this issue de novo and conduct separate analyses concerning statutory and constitutional rights, yet arrive at the same conclusion: Russell was not denied his right to a speedy trial.
a. Statutory right
¶ 11. The supreme court case of Sharp v. State, 786 So.2d 372 (Miss.2001), addresses the procedure for determining whether or not one’s statutory right to a speedy trial has been violated.
The 270-day rule analysis is very fact specific and hinges upon which side (prosecution or defense) caused the delays. Section 99-17-1 states that “[u]nless good cause be shown, and continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned.” Thus, the reason for the delay is as important as who is responsible.
Sharp, 786 So.2d at (¶ 5). Russell was not arraigned, but we do know the date he waived his arraignment, which was June 25, 1999. For our purpose, we use this date to start the “270 day clock.” On August 5, 1999, approximately two weeks prior to the original trial date, an order was entered granting Russell’s ore tenus motion to allow him to see a psychologist, Dr. Gerald O’Brien. On that date the clock stopped running, since, “[t]ime set aside for a psychiatric evaluation does not weigh against the State ... this delay resulted from [the defendant’s] motion for psychiatric evaluation and ... the time is not attributable to the State because the clock was tolled pending the evaluation.” Elder v. State, 750 So.2d 540(¶ 16) (Miss.Ct.App.1999). The evaluation eventually took place on December 15, 1999. The record does not contain Dr. O’Brien’s report, so we have no indication as to the date such report was concluded; however, for the purposes of our calculations, we can conclude that the earliest possible date Dr. O’Brien’s evaluation could have been complete would have been December 15, 1999, so we start the clock again on that date. The clock stops again on May 22, 2000, which was the date the trial was set. Russell requested and was granted a continuance until May 30, 2000, so this time does not count against the State. We total the days which passed while the clock was “running,” and arrive at a total of 198 days from arraignment to trial, which is below the 270-day statutory time limit and does not amount to a violation of Russell’s statutory right to speedy trial.[1]
*558 b. Constitutional right
¶ 12. “[T]he right to a speedy trial is subject to a knowing and intelligent waiver. This Court will ‘indulge every reasonable presumption against the waiver of a constitutional right.’ Even when a defendant fails to assert his right to a speedy trial he does not permanently waive this right.” Berry v. State, 728 So.2d 568(¶ 3) (Miss.1999) (citations omitted). We find no indication that Russell made any knowing and intelligent waiver of this right, so we find it appropriate to address the issue of whether or not Russell suffered a violation of his constitutional right to a speedy trial.
Although complying with the 270-day rule is suggestive of whether the constitutional speedy trial right has been violated, it is not dispositive. There are different considerations. First, the constitutional right to a speedy trial attaches at the time of arrest rather than arraignment. Whereas the 270-day analysis is an exact mathematical computation of days, the constitutional right is a weighing test based upon the Barker factors, which “are (1) the length of delay, (2) the reasons for the delay, (3) assertion of the right to a speedy trial, and (4) prejudice to the defense.” Furthermore, “[a] delay in excess of eight months between arrest and trial establishes ‘presumptive prejudice’ sufficient to trigger analysis under Barker.”
Sharp, 786 So.2d at (¶ 15) (citations omitted). In reviewing this matter, we utilize a similar analysis as used in the discussion concerning statutory rights, but apply the Barker factors and use the date of arrest rather than the date of arraignment as a starting point for calculating the passage of time
¶ 13. First, concerning the length of delay for constitutional purposes, from the date of arrest, April 29,1999, to the date of trial, May 31, 2000, approximately 395 days passed. This was 155 days beyond the eight month time period which we have said is presumptively prejudicial.[2] Thompson v. State, 773 So.2d 955(¶ 7) (Miss.Ct.App.2000). This weighs in Russell’s favor. Finding such presumption, we move on to the second factor to find the reason for the delay.
¶ 14. As noted in the previous discussion, all of the delays noted were due to Russell’s actions; the 131 days which lapsed between the date of the order for psychological evaluation and the time of the actual exam was counted against him since he requested such evaluation, plus the continuance allowing a seven-day delay for trial in May 2000 was granted at his request and is counted against him. We interchange the date of arrest with our previous calculation noted in footnote one which utilized the date of arraignment and arrive at a total delay time of 255 days.[3] *559 Even though we have found that the total delay time minus the time attributable to Russell’s actions exceeds the eight month presumption, we look to the remaining Barker factors and weigh them cumulatively to arrive at a conclusion.
¶ 15. The third Barker factor concerns Russell’s assertion of his right to speedy trial. We note in the clerk’s papers that on April 6, 2000, Russell filed a motion to dismiss for violation of his right to a speedy trial. In denying such motion, the trial judge noted that Russell only alleges a statutory violation; however, he did preserve his right to appeal on this issue by virtue of his filing such motion. This weighs in Russell’s favor.
¶ 16. The fourth factor concerns prejudice resulting to Russell. The supreme court has stated:
Prejudice of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system .... The prejudice prong of the Barker analysis encompasses interference with a defendant’s liberty and actual prejudice in defending his case.
State v. Magnusen, 646 So.2d 1275, 1284 (Miss.1994). In his brief, Russell claims that the delay in trial resulted in an extensive loss of his freedom since he had been incarcerated since the date of the charge, that witnesses on his behalf had left the jurisdiction (although he fails to say who such witnesses were), and he had suffered great anxiety due to the charges against him. We recognize that Russell was incarcerated from the date of his arrest continuing to the date of trial; however, we also note that a bond was set for his release until trial, conceivably permitting him to leave prison should he so choose. Concerning actual prejudice he suffered in attempting to defend his case, Russell has stated no specific details concerning such prejudice suffered. Russell undoubtedly suffered anxiety in knowing he was being charged with serious crimes; however, we also note that, “[w]hile anxiety of the accused is a cause of concern, where there is no other prejudice asserted on the defendant’s part, this factor has little weight in his favor.” Estes v. State, 782 So.2d 1244 (¶ 13) (Miss.Ct.App.2000). We find this fourth factor weighs strongly in the State’s favor for the purposes of this analysis.
¶ 17. We finally arrive at a balancing of these four factors and find that when we balance all four factors, we find that the delay “overage” was approximately two weeks, all delays were attributable to Russell’s acts, and we cannot find that Russell was harmed by the delay from his arrest to this trial; thus, we find no violation of Russell’s constitutional right to a speedy trial. We affirm on this issue.
V. WAS RUSSELL DENIED EFFECTIVE ASSISTANCE OF COUNSEL?
*560 ¶ 18. Russell finally claims that he was denied effective assistance of counsel. We look to the standards set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in evaluating claims of ineffective assistance of counsel. “The two-pronged Strickland test instructs us to determine: ‘(1) whether counsel’s performance was deficient, and, if so, (2) whether the deficient performance was prejudicial to the defendant in the sense that our confidence in the correctness of the outcome is undermined.’ ” Washington v. State, 620 So.2d 966, 970 (Miss.1993). We find no indication that Russell’s counsel was ineffective.
Judicial scrutiny of counsel’s performance must be highly deferential.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action “might be considered sound trial strategy”.... In short, defense counsel is presumed competent.
Bailey v. State, 760 So.2d 781 (¶ 8) (Miss.Ct.App.2000) (citations omitted) (emphasis added).
¶ 19. Russell argues in part that he was prejudiced because his original counsel withdrew, that his attorney failed to file certain motions Russell thought were warranted and failed to object when Russell thought he should have, and failed to offer an acceptable witness to qualify as an expert on stun guns, among other things. The record shows that his attorney zealously represented him at the trial and continuously objected to the State’s submissions of evidence and witness testimonies. We conclude that the other matters about which Russell complains fall into the category of “sound trial strategy.” Even if Russell has found examples of less than responsible decisions, we recognize that there is no constitutional right to er-rorless counsel. Hill v. State, 749 So.2d 1143(¶ 18) (Miss.Ct.App.1999). Since his attorney was presumed competent and Russell has failed to show anything to rebut this presumption, and importantly has failed to show he suffered any prejudice, we find no merit to his claim of ineffective assistance of counsel. We affirm on this issue.
¶ 20. THE JUDGMENT OF THE RANKIN COUNTY CIRCUIT COURT OF CONVICTION ON COUNT I, KID-NAPING AND SENTENCE OF EIGHTEEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED; AND COUNT II, AGGRAVATED ASSAULT IS REVERSED AND REMANDED. COSTS OF THIS APPEAL ARE ASSESSED TO RANKIN COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, IRVING, MYERS, CHANDLER AND BRANTLEY, JJ„ CONCUR.

. Following is a more extensive evaluation of relevant dates and passages of time: From the date of arraignment (June 25, 1999) to the date the psychological evaluation was ordered (August 5, 1999), 40 days passed. From the date of the August 5, 1999 order for evaluation until the actual date of examination on December 15, 1999, 131 days passed, which time was tolled and is not counted against the State, since Russell requested the evaluation. From the date of the conclusion of examination (Dec. 15, 1999) until trial date (May 22, *558 2000), 157 days passed; however, we can subtract seven days from the 157 total since Russell asked for a continuance and the trial was actually held on May 30, 2000. We calculate the total days against the State (40 + 157 = 197), and the total days against Russell (131 + 7 = 140). To find the total delay time, we subtract the total delay time attributable to Russell (140 days) from the total time from arraignment to trial, which was 338 days, and arrive at a total delay time of 198 days, which is less than the 270-day statutory time limit.

. We convert months to days, reasoning that each month contains approximately 30 days (8 months x 30 days/month = 240 days).

. Refer to footnote number one which lists those significant dates we use in arriving at the following results;
Date of arrest to date that Russell’s requested psychological evaluation was ordered: 97 days;
Date of psychological evaluation order to actual date of examination: 131 days;
*559 Date of conclusion of examination until trial date: 150 days;
Continuance granted per Russell’s request pushing trial date back: 7 days
Total days against the State (97 + 150 = 247); Total days against Russell (131 + 7 = 140); Total delay time = 255 days (subtract the total delay time attributable to Russell (140 days) from the total time from arrest to trial (395 days)).